Nicholas W. RIEGLER Jr. *v.*
Mary Miller RIEGLER

75-180                                          532 S.W. 2d 734

Opinion delivered February 2, 1976
[Rehearing denied March 8, 1976.]

*Howell, Price, Howell & Barron,* for appellant.

*Stubblefield & Matthews,* for appellee.

J. FRED JONES, Justice. This is an appeal by Nicholas W. Riegler, Jr. from a chancery court order in which he contends that the chancellor erred in awarding child support payments and college education payments to an adult child where there was no contract. The appellee, Mary Miller Riegler, has cross-appealed contending that the chancellor erred in refusing to increase the amount of alimony and in ordering its termination after June 8, 1975, and in failing to increase the monthly child support. She also contends that the appellant should be required to pay her attorney's fees in both the trial court and on appeal.

The parties to this proceeding were divorced in 1966 and this is the fourth appeal to this court growing out of the divorce litigation. See *Riegler v. Riegler,* 243 Ark. 113, 419 S.W. 2d 311 (1967); *Riegler v. Riegler,* 244 Ark. 483, 426 S.W. 2d 789 (1968); and *Riegler v. Riegler,* 246 Ark. 434, 438 S.W. 2d 468 (1969). The case reported in 244 Ark., *supra,* was an appeal from a circuit court judgment, but the other two appeals and the present one were from decrees of the chancery court presided over by the same chancellor who has had the parties before him from time to time over the past decade.

The parties had five daughters when the divorce was granted in 1966. Four of the daughters at that time were minors under 18 years of age. Their custody was awarded to the appellee Mrs. Riegler and the appellant was ordered to pay to the appellee alimony and support money for the four minor children. During the intervening years since the divorce three of the four minor children went to live with the appellant and have attained their majority. The youngest daughter remained with the appellee and also reached her majority on October 31, 1974.

The appellee was being paid $350 per month alimony and $250 per month child support when, on October 11, 1974, the appellant filed a petition to terminate the child sup-

port upon the youngest child becoming 18 years of age and to terminate the alimony payments because of change in conditions. The appellee filed a counter-petition praying for an increase in both alimony and child support. The chancellor ordered the child support continued at $250 per month until the daughter finished high school and entered college, at which time the child support payments would be increased to $350 per month until graduation from college or further orders of the court. Alimony payments were terminated as of June 8, 1975.

A part of what we said when this matter was first before us in 1967 (*Riegler* v. *Riegler*, 243 Ark. 113, 419 S.W. 2d 311) is pertinent to the decision we reach in the matter now. In the 1967 opinion we said:

> "The matter of the children's college education was deferred for a later decision. What we have to say in Part V of this opinion may be pertinent if that question comes up in the future.

\* \* \*

> V.   The decree for separate maintenance awarded Mrs. Riegler $600 a month 'for maintenance of herself and the four children now in her custody.' In the interval between that decree and the one now being reviewed Mrs. Riegler spent a total of $3,187.68 for college educational expenses of her oldest daughter, who was of age when the separate maintenance decree was entered, and for similar expenses of her next daughter, who reached 18 before the rendition of the later decree. The chancellor directed Dr. Riegler to repay $2,749.00 of those outlays.

> That direction was an error. Ordinarily a mother who spends more for child support than the court has allowed her cannot recover the excess, because an award of child support ought not be increased retroactively. She should apply in advance for a larger allowance. *Gant* v. *Gant,* 209 Ark. 576, 191 S.W. 2d 596 (1946). On the other hand, a father may by contract bind himself to go

beyond the decree in supporting a daughter who has reached her majority. Worthington v. Worthington, 207 Ark. 185, 179 S.W. 2d 648 (1944). Mrs. Riegler insists that the proof establishes such a contract on Dr. Riegler's part.

We do not so find. Dr. Riegler testified as most fathers would, that he wanted all his children to have a college education. We do not read his testimony, however, as embodying an agreement to pay the expenses now at issue. To the contrary, he said that if he paid for his daughters' higher education he expected them to treat him with the respect due a father and to counsel with him about their college training. He complained, among other things, that his oldest daughter had told him to go to hell and had declared that the only thing he had to do with her education was to give her the money to spend as she chose. On the proof as a whole Mrs. Riegler did not sustain the burden of proving an agreement for support over and above the allowance made by the separate maintenance decree."

Miss Katherine Elizabeth Riegler, the young lady involved in the case at bar, testified that she lives with her mother in Memphis, Tennessee, in a condominium her mother is purchasing. She said she was in the twelfth grade in high school; that she has a 1973 model Chevelle Malibu automobile which she uses for transportation to and from school and to and from her part-time employment two days per week at about $2.25 an hour. She said her earnings at part-time work amounted to about $20 per week. She testified that she was 18 years of age on October 31, 1974, and would graduate from high school in May, 1975. She said she planned to attend the University of Tennessee at Knoxville where she plans to major in accounting with a minor in computer science. She said she had a savings account of $140, but has no other money with which to defray her college expenses except what her father has given her. She testified that she had made an estimate of what her first year expenses in college would amount to and that it amounted to $526.67 per month. She said this estimate consisted of $158.33 per month for room, board and fees, and $166.67 per month for clothes. She

said she would need $30 per month for gasoline, $60 per month for spending money and $66.67 per month for sorority expenses. She said the maintenance of her automobile would amount to $25 per month. She said she respected and admired her father greatly and that she would like for him to pay her expenses in college. She said she would be willing to counsel with her father about the things she would use the money for if he would pay her expenses. She said that if her father does not finance her college education, she will have to get a student loan or maybe go to school part-time and try to get on a student work program, or else she will have to stay in Memphis and go to a technical school for two years and see if she can get a job that way.

On cross-examination Miss Riegler testified that she purchased her Malibu automobile June 13, 1973, and did not discuss the purchase with her father, for the reason that he was not paying for it. She said she had decided to attend the University of Tennessee because a number of her friends were attending that university, and that she had not discussed those plans with her father. She said she simply had not had time to discuss her plans with her father; that he had his medical practice to attend to and she was not in town enough to discuss her plans with him.

"Q. You went ahead and made your plans without even finding out if he wanted to send you to the University of Tennessee?

A. It seems to me it would be up to my choice where I would like to go to college."

Miss Riegler said she had a savings account at the time her mother and father were divorced, but that she drew it all out. She said that part of it went toward the payment of her automobile but that she couldn't tell exactly how much. She said she was drawing out quite a bit from her savings account and supposed she applied $600 or $700 of it on her automobile. She said she did not know how she got her savings account; that she just "had it put in there." She testified on cross-examination that one dress for college can run anywhere from $25 to $50 each; that she is not attemp-

ting to force her father to pay $166.67 per month for her clothes, but that she guesses she is asking the court to make him do so. She then testified as follows:

"Q. Can you tell me again where you got this figure of $166.67? Do you spend that much money for clothing now?

A. Roughly, yes.

Q. What do you pay for your dresses?

A. $25.00 to $50.00 on some dresses.

*   *   *

Q. Have you discussed with your father whether or not he wanted to send you to school in $50.00 dresses?

A. No.

Q. Don't you think it would be a proper thing to take up with him?

A. I don't know. It seems like I could buy whatever I wanted to, you know, in clothing, which is whether it was $50.00 to $1,000.00 dress, if I wanted to wear it.

Q. You think that would be up to you rather than your father?

A. It would be up to both of us, but it would be more of my choice of what I like to wear.

Q. Now, have you discussed with your father whether or not he thinks you should have an automobile at the University of Tennessee?

A. No.

Q. Don't you think that is a proper item for him to make some decisions about?

A. Not really."

On redirect examination Katherine Elizabeth said her father was busy and out of town quite a bit and it was rather difficult for her to get in touch with him; that if he furnished her expenses while in college she would be willing to discuss matters with him and let him know exactly how she spent the money. She said she and her father had never corresponded by mail; that she had started to write letters to him several times but she didn't know what to say to him. She said she just simply did not know her father.

It is obvious from the overall record that the appellant and his youngest daughter have become more or less estranged over the past nine years. While the daughter said she would be willing to discuss college with her father and would be willing to counsel with him about what she used the money for if he would support her while attending college, she testified that she had already arranged to attend the University of Tennessee at Knoxville and had already been accepted and had arranged for a place to stay while attending the university, and that if her father did not continue to support her it would be necessary to obtain a student loan or part-time work. She said it seemed to her that she could buy whatever she wanted to in the way of clothing whether a dress cost $50 or $1,000, if she wanted to wear it; that she did not really think an automobile, while attending the university, would be a proper item for her father to make some decision on.

Pertaining to his daughter's continued college education, the appellant testified in part as follows:

"Q. Well, suppose that Kathy right now would come up to you and say, 'Father, I want and need your help in going to college.' What would be your attitude about it?

A. My attitude would be to accept her as a daughter and then we would begin to work out what would have to be done to accomplish the means.

Q. What do you mean by, accepting her as a daughter?

A. I have always accepted her as a daughter. I would take her in as I did any of my daughters. I would discuss this with her and we would decide and she if she can follow what my requirements would be and if I could follow what her requirements are.

Q. By taking her in, do you mean you would require her to come and live in your home?

A. I did not say that.

Q. What do you mean by taking her in? You said, 'I would take her in.' What did you mean by that?

A. I would sit down and discuss the thing with her and follow through with her and do anything I could to assist my daughter."

Dr. Riegler testified that he was willing to pay Kathy's expenses until she graduated from high school but was not agreeable to paying her expenses in college or contribute further to her unless she changed her attitude toward discussing matters with him.

The appellant in the case at bar gave his three older daughters a college education after they attained their majority, but they discussed with him the college of their choice and they complied with reasonable restrictions he prescribed for them while attending college. The question in the case at bar as to the youngest daughter is not whether appellant is morally obligated to assist her financially while attending college, but the question is whether he is *legally* obligated to do so under the evidence in this case. We approved the chancellor's "slight extension of the appellant's minimum duty to support the older child" in *Matthews* v. *Matthews*, 245 Ark. 1, 430 S.W. 2d 864, but that duty has not been extended to an entire college education in Arkansas under such facts as appear of record in this case. The chancellor found, as recited in paragraph three of his order, as follows:

"(3) That the youngest daughter of the parties reached her 18th birthday on October 31, 1974; that she is

without physical or mental infirmities, and is not an abnormal child; that there has been no contract entered into on the part of defendant to pay for the college education expenses of his said daughter who is now a senior in high school, making good grades, due to graduate at the end of the current school year in May or June, 1975, desires and has definite plans to enter college upon graduating from high school and to continue and complete her college education without interruption."

The chancellor further set out his reasoning in language as follows:

"I was referring to *Jerry* v. *Jerry*, 235 Ark. Well, of course, as you all know, years ago, fifty or more years ago, it was not considered of much importance to have a college education or a degree, but in recent years it is much more important. A child can hardly get started or even apply for a job without some college education. So, this is not clear here. It says in other cases, in 254 Ark. says, if the father is financially able the child is entitled to such support as will sustain the manner and type of living to which it is accustomed. It doesn't say whether before or after it reaches a certain age, its majority. In addition to the actual needs of the child, the father has the legal duty to give the child those advantages which are reasonable contributions, etc., which seems to indicate that the child should have at least some college education."

The case to which the chancellor was referring in 254 Ark. appears to have been *Sain* v. *Smith*, 254 Ark. 720, 495 S.W. 2d 865 (1973), or *Thompson* v. *Thompson*, 254 Ark. 881, 496 S.W. 2d 425 (1973). In *Sain* the child was 16 years of age and in *Thompson* the appellant-father stopped payment without court order and we approved the award of arrears which accumulated after one child married and another reached majority.

In *Jerry* v. *Jerry*, 235 Ark. 589, 361 S.W. 2d 92 (1962), the divorced parents of three minor children agreed upon $200

per month for the maintenance and education of the children. When the oldest child, a daughter, became 18, she had finished high school and desired to enter college. The father stopped one-third of the payment when she became 18. The chancellor held he was no longer obligated but continued payment for the other two at $200 per month. The chancellor ordered the payment of arrears for the support of the child who had reached her majority. In affirming the decree this court said:

> ". . . Ark. Stats. § 57-103 makes it plain that 'females of the age of eighteen (18) years shall be considered of full age for all purposes. . . . ' In *Missouri Pacific Railroad Company et al* v. *Foreman*, 196 Ark. 636, 119 S.W. 2d 747 (at page 651 of the Arkansas Reports) we said: 'Ordinarily, there is no legal obligation on the part of a parent to contribute to the maintenance and support of his children after they become of age.' A significant word in the above quotation is the word 'ordinarily,' showing that the Court realized there might be circumstances which could impose on a parent the duty to support a child after such child became of age. This fact was expressly recognized in *Upchurch* v. *Upchurch*, 196 Ark. 324, 117 S.W. 2d 339 (page 327 of the Arkansas Reports) where it was stated: 'It is, of course, the duty of the father to contribute to the support of his children even after they are of age if the circumstances are such as to make it necessary.' This court has uniformly held, based on Ark. Stats. § 34-1213, that the amount allowed for child support is subject to modification when required by changed conditions. See: *Watnick* v. *Bockman*, 209 Ark. 696, 192 S.W. 2d 131."

In *Petty* v. *Petty*, 252 Ark. 1032, 482 S.W. 2d 119 (1972), this court reversed a chancellor's decree terminating child support for an 18 year old child. But in that case we pointed out that the girl was "disabled and unable to earn a livelihood." In *Matthews* v. *Matthews, supra,* we affirmed a chancellor's order continuing child support for an 18 year old girl until she finished high school. The "circumstances of necessity" to justify the order were pointed out as follows:

"Had the chancellor terminated the appellant's support payments for Dinah Gale as soon as she became of age, it may be assumed, as far as this record shows, that she would have been forced to drop out of high school to support herself, there being no obligation on the part of either of her parents for her continued maintenance. We know, by common knowledge, that a high school diploma is of almost inestimable value to a young person who seeks to make his or her own living. The appellant, as a result of having taken no appeal from the supplementary October decree and as a result of having offered no new testimony at the hearing with respect to the modification of that decree, is not in a position to contend that he has suffered an undue hardship by having to support his daughter during the six months between her coming of age and her graduation from high school. Upon the facts of this case — and our decision of course is limited to those facts — we sustain the chancellor's slight extension of the appellant's minimum duty to support the older child."

The appellant's daughter involved in the case at bar has reached her majority and is not physically or mentally handicapped. We conclude, on trial *de novo*, that the appellant should have been relieved of the legal obligation to support his youngest daughter after she attained her majority and graduated from high school.

Mrs. Riegler, the appellee and cross-appellant, testified that she now lives in Memphis, Tennessee, and that her daughter Katherine lives with her. She said that they live in a condominium she has purchased in Memphis. She said that the alimony of $350 per month was fixed by court order on July 5, 1968, and the child support for Katherine in the amount of $250 was fixed in May, 1969. She said there had been some pretty drastic changes since July, 1968, and May, 1969. She said one of the changes was the increased cost of clothing, feeding and maintaining a young adult as compared to a teenage child. She said that she purchased a condominium in Memphis in August, 1973, and that when she first went to Memphis, Katherine required special clothing at Laus Anne, a private school where she was enrolled. She said

she herself went to school and put herself through the University of Arkansas at Little Rock. She said she applied for admission to the graduate school of social work but was rejected; that she applied to the University of Tennessee at the Memphis branch and was accepted, and that was the reason she moved to Memphis. She said that since the aforesaid dates she has had to drop her country club membership in Little Rock; that she does not still pay dues but that the membership has not been sold and she has received no money from it. She said that during her marriage she had a fulltime maid and a part-time maid and that she can no longer afford a maid. She said she used to be able to go to a beauty shop on a weekly basis but that she can no longer afford to do so. She said she had sold some of her stock, and that the stock she inherited from her aunt, which was valued at $113,220.68 in 1969, is now only worth $27,047.50. She said since selling some of the stock she does not receive the dividends that she did receive. She said she only has about $15 in savings and that the $6,900 she had in savings in 1968 or 1969 had gone for living expenses. She said on May 23, 1972, she sold 25 shares of General Telephone & Electronics and received $731; that on that same date she sold 100 shares of General Telephone & Electronics and received $2,938; and also sold 200 shares of Portland General Electric and received $4,275. She said that on November 17, 1972, she sold 50 shares of General Telephone & Electronics and received $1,506. She said on the same date she sold 200 shares of Portland General Electric from $4,374, and in April, 1972, she sold 106 shares of Bullock Fund for $1,738.40; that on August 8, 1973, she sold 100 shares of J. P. Morgan for $6,355; that on December 27, 1973, she sold an additional 100 shares of J. P. Morgan for $6,584.80, and on December 6, 1974, she sold an additional 50 shares for $2,640.

In answer to interrogatories Mrs. Riegler said her income from her employment in 1972 totaled $9,547; that in 1973 it amounted to $8,936 and for 1974 it amounted to $9,-435.16.

Mrs. Riegler testified on direct examination that in 1974 it took $22,581.76 for her and Katherine's living expenses for that year. She said their living expenses for 1973 amounted to

$21,021.69. She said she is now employed as a social worker at the Les Passees Rehabilitation Center in Memphis at $528 and some cents per month. She said that her work required her to be well dressed which would entail additional expenses in connection with her job. She said her standard of living is lower than it had been. She said she was no longer free to go into a store and buy any dress she saw at any price, and that money is simply no longer available to take vacations.

Mrs. Riegler testified as to her income and expenses partially from her income tax returns and on cross-examination she testified that under her Schedule D of income tax returns for 1973, she showed a net gain on the sale of J. P. Morgan stock of $8,846; that she showed on the same returns a long-term capital gain on these stocks of $8,800. Mrs. Riegler testified that she deposited the money from her sales of stock in the Pulaski Heights Bank, but on cross-examination she was at a loss to explain why her bank records did not show the deposits.

It is apparent from the overall record that Mrs. Riegler still has income in her own right from investments she had made; that she still has a substantial interest in trust property of considerable value and which is now in litigation; that the appellant has been paying alimony to the appellee as directed by the court over the past nine years, during which time the appellee has attended college and obtained a master's degree in social work; that she is now employed in social work where she is capable of earning, and actually is earning, $9,574 per year. Consequently, we are unable to say that the chancellor erred in ordering alimony terminated after June 8, 1975, or that the chancellor's order was against the preponderance of the evidence.

The appellee's attorneys have been paid substantial fees over the history of this litigation and we are unable to say that the chancellor abused his discretion in refusing to award attorney's fees against the appellant in this case.

The decree is reversed as to the $350 per month child support until graduation from college and in all other respects the decree is affirmed.

Reversed in part on appeal and affirmed on cross-appeal.

BYRD, J., not participating.